## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KELLY VANEPPS-SHIRAY, as Guardian of the Person and Estate of ASHLEE SMITH, | : : : : | No. 2:23-cv-0047 |
| Plaintiff, | : : : | |
| v. | : : : | **JURY TRIAL DEMANDED** |
| CITY OF HERMITAGE, LOUIS LAUDERBAUGH, CHRISTOPHER MORSE, UNIVERSITY OF PITTSBURGH PHYSICIANS, UPMC HORIZON, UPMC – HORIZON GREENVILLE, MASASHI OKUBO, MCGONIGLE AMBULANCE SERVICE, INC., NOAH AMRHEIN, CARLY FARINELLI, MATT CHLPKA, HEATHER BUSH, and KAYLA KERR, | : : : : : : : : : : : : : | |
| Defendants. | : : | |

## COMPLAINT

Plaintiff Kelly Vanepps-Shiray, as Guardian of the Person and Estate Ashlee Smith, by her counsel, hereby files this Complaint as follows:

### INTRODUCTION

1.      On January 15, 2021, Doctor Okubo (defined *infra*) served as the petitioner for the involuntary mental health commitment of Ms. Smith, who he knew or should have known posed an imminent risk of violent flight during the transport because she was acutely psychotic from schizophrenia. Doctor Okubo knew that she previously fled and assaulted several police officers on at least two occasions in the six hours preceding her involuntary commitment, including while he was under her care at UPMC Greenville (defined *infra*). Nevertheless, Doctor Okubo ordered and/or directed that certain EMS Defendants (defined *infra*) *not* restrain Ms. Smith during the

transport for her involuntary mental health commitment, which was to an outside facility and/or hospital that involved at least 25 minutes in travel time.

2.      Because the EMS Defendants followed Doctor Okubo's order and/or directive, and deliberately disregarded their protocols, regulations, policies, experience, training, and/or the Pennsylvania Code, Ms. Smith attempted to flee from the transport ambulance, during which time she violently attacked certain EMS Defendants. When Officers Lauderbaugh and Morse (defined *infra*) arrived at the scene for assistance, they used an excessive amount of force to punch and choke Ms. Smith into compliance. Thereafter, with the assistance of the EMS Defendants, they restrained her in a prone position with her hands handcuffed behind her back, and soft restraints binding her feet, legs, back, and shoulders. Officers Lauderbaugh and Morse, and the EMS Defendants, intentionally left Ms. Smith restrained in a prone position for the remainder of her transport, causing her to be significantly deprived of oxygen and inhibiting her respiratory process. As a direct and proximate result of her prone restraints, Ms. Smith suffered a cardiac arrest (asystole) for several minutes, depriving her of adequate oxygen, before being resuscitated.

3.      At all relevant times, each Defendant knew that Ms. Smith was pregnant. Miraculously, Ms. Smith gave birth to her daughter months later, even after suffering from anoxic encephalopathy in the back of the transport ambulance. Ms. Smith, however, has suffered a catastrophic brain injury and lost all or most of her neurological and cognitive functioning because of the injuries she sustained due to Defendants' negligent actions and/or omissions.  As a result of her injuries, Ms. Smith, among other profound harms and losses, is unable to meaningfully touch, hug, kiss, or otherwise communicate with her daughter (or her older daughter, mother, family, or friends). Her mother, Ms. Vanepps-Shiray, is now the legally appointed guardian over her person and estate.

## PARTIES

4.     Ms. Vanepps-Shiray is an adult individual residing in Pennsylvania. She was appointed the plenary guardian of the person and estate of Ms. Smith on July 2, 2021. Ms. Smith was adjudicated incapacitated and without sufficient mental and decision-making capacity because of the injuries she sustained because of the conduct described herein.

5.     Defendant City of Hermitage ("Hermitage") is a city of the third class located in Mercer County, Pennsylvania. Hermitage owns, operates, and controls the Hermitage Police Department (the "HPD"). The HPD has a principal place of business at 800 North Hermitage Road, Hermitage, Pennsylvania 16148. At all relevant times, Hermitage was acting by and through its duly authorized employees, agents and/or administrators of the HPD, who at all relevant times were acting within the course and scope of their employment, under color of state law, and in accordance with its policies, practices, and customs.

6.     Defendant Louis Lauderbaugh ("Officer Lauderbaugh") is an adult individual. At all relevant times, he was employed as a police officer by the HPD, which is located at 800 North Hermitage Road, Hermitage, Pennsylvania 16148. At all relevant times, Officer Lauderbaugh acted under color of state law, in the scope of his employment, and in accordance with the policies, practices and customs of the HPD.  He is sued in his individual capacity.

7.     Defendant Christopher Morse ("Officer Morse") is an adult individual. At all relevant times, he was employed as a police officer by the Hermitage Police Department ("HPD"), which is located at 800 North Hermitage Road, Hermitage, Pennsylvania 16148. At all relevant times, Officer Morse acted under color of state law, in the scope of his employment, and in accordance with the policies, practices and customs of the HPD.  He is sued in his individual capacity.

8.     Defendant University of Pittsburgh Physicians ("UPP") is a corporation or other entity chartered and existing under the laws of the Commonwealth of Pennsylvania. UPP has a principal place of business at 200 Lothrop Street, Pittsburgh, Pennsylvania 15213. At all relevant times, UPP engaged in providing medical services through its agents, ostensible agents, servants, representatives, and/or employees, including, but not limited to, one or more of the other named Defendants.

9.     Defendant UPMC Horizon ("UPMC Horizon") is a corporation or other entity chartered and existing under the laws of the Commonwealth of Pennsylvania. At all relevant times, UPMC Horizon owned, operated, managed, and/or controlled a general hospital situated in Greenville, Pennsylvania (County of Mercer) known as "UPMC – Horizon Greenville." UPMC Horizon has a principal place of business at 110 North Main Street, Greenville, Pennsylvania 16125. At all relevant times, UPMC Horizon was acting by and through its agents, ostensible agents, servants, representatives, and/or employees, including, but not limited to, one or more of the other named Defendants herein.

10.     Defendant UPMC – Horizon Greenville ("UPMC Greenville") is corporation or other entity chartered and existing under the laws of the Commonwealth of Pennsylvania. UPMC Greenville has a principal place of business at 110 North Main Street, Greenville, Pennsylvania 16125. At all relevant times, UPMC Greenville was acting by and through its agents, ostensible agents, servants, representatives, and/or employees, including, but not limited to, one or more of the other named Defendants herein

11.     At all relevant times, all physicians, nurses, and other healthcare personnel who observed, cared for and/or treated Ms. Smith at UPMC Greenville were the agents, ostensible agents, servants, representatives, and/or employees of one or more of the named Defendants in this

Complaint—namely, UPP and/or UPMC Horizon—and were acting while in and upon the business of said Defendants and while in the course and scope of their employment. The professional liability claims asserted against UPP and UPMC Horizon are for the professional negligence of all its actual, apparent, and/or ostensible agents, servants and employees who participated in the care, treatment, management, and clinical decision-making for Ms. Smith at UPMC Greenville. The professional liability claims being asserted against them include direct claims for corporate negligence. UPP and UPMC Horizon had actual or constructive notice of the actions of its agents, ostensible agents, servants, representatives, and/or employees.

12.     At all relevant times, Defendant Masashi Okubo, MD ("Doctor Okubo") acted as an appointed agent, ostensible agent, servant and/or employee of UPP and UPMC Horizon, and within the course and scope of his agency, while utilizing business addresses at 200 Lothrop Street, Pittsburgh, Pennsylvania 15213 and 110 North Main Street, Greenville, Pennsylvania 16125.

13.     Defendant McGonigle Ambulance Service, Inc. ("McGonigle Ambulance") is a corporation existing under the laws of the Commonwealth of Pennsylvania. McGonigle Ambulance has a principal place of business at 1090 E State Street, Sharon, Pennsylvania 16146. At all relevant times, McGonigle Ambulance was acting by and through its agents, ostensible agents, servants, representatives, and/or employees, including, but not limited to, one or more of the other named Defendants herein.

14.     At all relevant times, Defendant Noah Amrhein ("EMT Amrhein") was acting as an appointed agent, apparent agent, servant, and/or employee of McGonigle Ambulance and within the course and scope of his agency, utilizing a business address at 1090 E State Street, Sharon, Pennsylvania 16146.

15.     At all relevant times, Defendant Carly Farinelli ("Paramedic Farinelli") was acting as an appointed agent, apparent agent, servant, and/or employee of McGonigle Ambulance and within the course and scope of her agency, utilizing a business address at 1090 E State Street, Sharon, Pennsylvania 16146.

16.     At all relevant times, Defendant Matt Chlpka ("Paramedic Chlpka") was acting as an appointed agent, apparent agent, servant, and/or employee of McGonigle Ambulance and within the course and scope of his agency, utilizing a business address at 1090 E State Street, Sharon, Pennsylvania 16146.

17.     At all relevant times, Defendant Heather Bush ("EMT Bush") was acting as an appointed agent, apparent agent, servant, and/or employee of McGonigle Ambulance and within the course and scope of her agency, utilizing a business address at 1090 E State Street, Sharon, Pennsylvania 16146.

18.     At all relevant times, Defendant Kayla Kerr ("Paramedic Kerr") was acting as an appointed agent, apparent agent, servant, and/or employee of McGonigle Ambulance and within the course and scope of her agency, utilizing a business address at 1090 E State Street, Sharon, Pennsylvania 16146.

19.     EMT Amrhein, Paramedic Farinelli, Paramedic Chlpka, EMT Bush, Paramedic Kerr are collectively referred to as the "EMS Defendants."

20.     The EMS Defendants, as well as UPP, UPMC Horizon, UPMC Greenville, and Doctor Okubo, are collectively referred to as the "Medical Defendants."

21.     Professional liability claims are being asserted against all the Medical Defendants.

**JURISDICTION AND VENUE**

22.     This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution, as well as Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4). This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because each claim arose in the Western District of Pennsylvania.

**FACTS**

24.     Around 12:41 p.m. on January 15, 2021, two officers from the Greenville Police Department ("GPD") responded to a report that Ms. Smith was sitting in the street naked.

25.     The report identified Ms. Smith as being amid a mental health crisis.

26.     When the GPD officers arrived, they identified Ms. Smith, who then fled.

27.     Ms. Smith returned to the area of the officers where she resisted lawful commands for arrest and otherwise became combative with them, attempting (unsuccessfully) to take control of one of the officer's tasers.

28.      The officers ultimately handcuffed Ms. Smith without further incident, although she remained resistive and combative with them during transport to UPMC Greenville for psychiatric evaluation.

29.     When Ms. Smith was received by UPMC Greenville, the officers from the GPD told medical staff and other professionals about her flight and violent behavior.

30.     All attending medical staff and other professionals at UPMC Greenville knew or should have known that she was suffering from acute psychosis, that she was found naked in the street, and that she was resistive, combative, and a flight risk prior to her arrival.

31.     Doctor Okubo was assigned as her attending physician at UPMC Greenville.

32.     At all relevant times, Doctor Okubo and all other attending medical staff knew or should have known why Ms. Smith was brought to UPMC Greenville.

33.     At all relevant times, Doctor Okubo treated Ms. Smith as being acutely psychotic.

34.     Doctor Okubo's treatment centered on the necessity for an inpatient psychiatric admission to a location other than UPMC Greenville, and the impact that illicit substances might be having on any acute psychosis that Ms. Smith was exhibiting.

35.     During her treatment at UPMC Greenville, Doctor Okubo and all other attending medical staff learned that Ms. Smith was diagnosed schizophrenic, that she had not been taking her medication for over two months, and that she was exhibiting memory loss and/or memory lapse from her serious mental health condition.

36.     Doctor Okubo and all other attending medical staff also learned that Ms. Smith had reportedly been exhibiting psychotic behavior for at least several days prior to her admission at UPMC Greenville, which was solely attributable to her mental health disorder(s).

37.     Doctor Okubo and all other attending medical staff further learned that Ms. Smith admitted to using Phencyclidine (also known as PCP) and marijuana earlier that morning.

38.     Around 2:00 p.m., Ms. Smith successfully persuaded attending medical staff to release her soft restraints in her hospital room, at which time she fled.

39.     Shortly thereafter, Ms. Smith was apprehended in the parking lot at UPMC Greenville by hospital police, during which time she exhibited violent behavior, including aggressively lunging toward them with the intent to injure.

40.     Doctor Okubo immediately learned that Ms. Smith attempted to flee from UPMC Greenville, and that she was apprehended during a violent encounter with hospital police.

41.     Doctor Okubo thus ordered that Ms. Smith be restrained and observed with a psychiatric sitter for the duration of her admission at UPMC Greenville, finding that she was a violent flight risk who needed a proper psychiatric evaluation at a more suitable hospital.

42.     Doctor Okubo also ordered hospital police to observe and monitor Ms. Smith.

43.     Although Ms. Smith was supposedly being evaluated and observed by behavioral health specialists at UPMC Greenville, she was not administered any psychiatric medications that would have alleviated or reduced her acute psychosis.

44.     According to medical records, there is no evidence that Ms. Smith was assessed by behavioral health specialists at UPMC Greenville in any meaningful way.

45.     To the extent that Ms. Smith was assessed by behavioral health specialists at UPMC Greenville, she was found to be incompetent for assessment because of her psychosis.

46.     Doctor Okubo never removed the medical restraint order that he imposed upon Ms. Smith at UPMC Greenville because she remained acutely psychotic at all relevant times and was a known violent flight risk who was exhibiting manic behavior.

47.     Around 6:00 p.m., following the results from laboratory testing, Doctor Okubo ruled out the possibility that illicit substances like PCP or THC were causing Ms. Smith's acute psychosis.

48.     Although Doctor Okubo ordered a drug urine screening, he did not order any labs to determine the toxicity levels of any illicit substances.

49.     The findings for PCP and THC were *unconfirmed* positive.

50.     Doctor Okubo ruled out the possibility of drug overdose.

51.     Sometime between 6:30 and 7:30 p.m., after determining that Sharon Regional Hospital was a more appropriate place for Ms. Smith to be evaluated for her mental health condition, Doctor Okubo completed a petition for her involuntary mental health commitment.

52.     Doctor Okubo served as the committing petitioner over Ms. Smith.

53.     At all relevant times, Ms. Smith knew that she was being involuntarily committed for mental health evaluation and treatment.

54.     On the UPMC Horizon Physician Certification Statement for Non-Emergency Ambulance Services that was executed by Doctor Okubo on January 15, 2021, he stated that Ms. Smith needed transport for "psych eval/acute psychosis."

55.     Prior to this involuntary commitment, blood and urine cultures and specimens also confirmed that Ms. Smith was in the early stages of pregnancy.

56.     Despite the unconfirmed positive results for PCP and THC, Doctor Okubo determined that Ms. Smith was not at risk of overdose, nor was she suffering from any overdose.

57.     Doctor Okubo determined that Ms. Smith was not suffering from drug-related psychosis at all.

58.     Doctor Okubo also ruled out metabolic acidosis while Ms. Smith was under his care and observation.

59.     Around 6:51 p.m., Doctor Okubo diagnosed Ms. Smith as suffering from acute psychosis and an early pregnancy.

60.     Because Doctor Okubo deemed Ms. Smith to be free from any other emergent medical conditions besides her acute psychosis, he requested an immediate transport to Sharon Regional Hospital under the involuntary mental health commitment.

61.     Around 7:00 p.m., after Doctor Okubo and other attending medical professionals completed the involuntary commitment forms, EMT Amrhein and Paramedic Farinelli were dispatched to transport Ms. Smith from UPMC Greenville to Sharon Regional Hospital as an involuntary mental health commitment.

62.     EMT Amrhein and Paramedic Farinelli left UPMC Greenville around 7:35 p.m, after taking at least 20 minutes to load Ms. Smith for transport and learn her history and present condition.

63.     EMT Amrhein and Paramedic Farinelli were fully briefed on her history and present condition, including her high risk for resistance, flight, violence, and unreliable and dynamic onset behavior due to acute psychosis.

64.     EMT Amrhein and Paramedic Farinelli knew that Sharon Regional Hospital was at least a 25-minute trip for Ms. Smith's transport and involuntary commitment.

65.     EMT Amrhein and Paramedic Farinelli knew or should have known that Ms. Smith required restraints during transport because of her past and present history of flight, resistance, and combat, as well as her acute mental health condition.

66.     EMT Amrhein and Paramedic Farinelli also knew that Ms. Smith was pregnant, and that restraints were necessary to protect the fetus because of her past and present history of flight, resistance, and combat, as well as her acute mental health condition.

67.     Doctor Okubo and other attending medical staff at UPMC Greenville, however, told EMT Amrhein and Paramedic Farinelli that Ms. Smith "pinky promised" not to attempt to flee, resist, or otherwise be combative during transport.

68.     Despite her obvious presentation as a violent flight risk, despite knowledge that Ms. Smith had recently persuaded medical staff to loosen her restraints in order to escape, despite repeated and ongoing attempts at flight, and despite his diagnosis that Ms. Smith was suffering ongoing acute psychosis, Doctor Okubo ordered and/or directed EMT Amrhein and Paramedic Farinelli *not* to restrain her during transport because of her "pinky promise."

69.     Significantly, at all relevant times preceding this order and/or directive, Doctor Okubo ordered that Ms. Smith be medically restrained while she was under his care because of the risks she posed to herself and others at UPMC Greenville

70.     Doctor Okubo and other attending medical staff at UPMC Greenville also denied EMT Amrhein and Paramedic Farinelli's request for sedation or other pharmacological options.

71.     EMT Amrhein and Paramedic Farinelli ultimately chose not to restrain Ms. Smith during the transport for her involuntary commitment, even though they had soft restraints readily available within the transport ambulance.

72.     At the time that Doctor Okubo made the foregoing order and/or directive not to restrain Ms. Smith during transport, he knew or should have known at least the following:

        a.      That she was acutely psychotic,

        b.      That she was unreliable, incompetent, and/or otherwise manipulative,

        c.      That she posed an imminent flight risk,

        d.      That she posed an imminent threat to herself and others,

        e.      That her mental health was causing her to be erratic, manic, and violent,

      f.      That acute psychosis has dynamic features, which sometimes include periods of calm in between instances of psychotic events, and

      g.      That she should have been restrained at all times during transport.

73.     EMT Amrhein and Paramedic Farinelli knew or should have known at least the following when making the decision not to restrain Ms. Smith during transport:

      a.      That they had soft restraints available on the transport gurney in the transport ambulance,

      b.      That they had pharmacological medications available in the transport ambulance to otherwise sedate or calm her,

      c.      That they had high concentrated oxygen available in the transport ambulance to otherwise sedate or calm her,

      d.      That she posed an imminent risk of flight,

      e.      That she posed an imminent risk of harm to herself and others,

      f.      That she attempted to flee from authorities on at least two prior occasions in the six hours leading up to her transport,

      g.      That she became aggressive and manic toward at least several police officers on at least two prior occasions in the six hours leading up to her transport,

      h.      That she was acutely psychotic at the time of transport,

      i.      That she was unconfirmed positive for PCP and THC at the time of transport,

      j.      That she was diagnosed schizophrenic and had not been taking her medication for the prior two months,

      k.      That in the days leading up to her transport, she was continuously exhibiting and manifesting manic and psychotic behavior that was aggressive in nature,

      l.      That she was acutely paranoid,

      m.      That she was manipulative, and

n.     That she was being involuntarily transported for the sole purpose of psychiatric evaluation.

74.     With respect to deciding not to restrain Ms. Smith, EMT Amrhein and Paramedic Farinelli stated the following:

> Pt requires transport for psychiatric evaluation at SRH ER. Staff states that pt came in via PD after being found nude in the street by passerby's. Pt is noted to have stopped her medication in November of 2020 and is known to have tested positive for pregnancy. Pt was combative and a severe flight risk, attempting to flee multiple times from the ER and requiring soft 4 point restraints. Upon EMS arrival, soft restraints are removed by the nurse and nurse states "pt pinky promised" that she would be calm and cooperative and not attempt to flee EMS. EMS requested multiple times for either medication sedation or restraints, which were denied by the nurse stating "she will be fine." Pt is noted to have multiple bruises and abrasions stemming from earlier altercations with both PD and the ER. Pt to be seen at SRH ER for further evaluation.

***

> Crew at pt side. Operations: Safety restraints, Patient loaded – Cold. Crew receives a verbal report from the nurse as well as paperwork. Crew requests either soft restraints or medication prior to transport for pt safety due to pt being combative and a flight risk. Pt's nurse and doctor declines, stating "pt pinky promised" that she would be calm and cooperative. Nurse removes cardiac monitor and IV prior to transport. Pt is assisted in standing and pivoting from the bed to the cot and is strapped in x5, side rails up x2. Pt is loaded into the unit by the crew.

75.     At all relevant times, Doctor Okubo and all other attending medical staff at UPMC Greenville documented the imminent flight risks that Ms. Smith posed, as well as the imminent threat she posed for harm to herself or others.

76.     At all relevant times, Doctor Okubo and all other attending medical staff at UPMC Greenville knew or should have known that Ms. Smith's alleged "pinky promise" could and/or should not be relied upon.

77.     Notwithstanding the grossly negligent actions and/or omissions of Doctor Okubo and/or the staff of UPMC Greenville as described herein, EMT Amrhein and Paramedic Farinelli knew or should have known of the danger transporting Ms. Smith without physical and/or chemical

restraints posed to Ms. Smith and/or themselves such that they knew or should have known to take additional protective measures.

78.     Specifically, EMT Amrhein and Paramedic Farinelli should have contacted their medical command physician or officer for guidance and/or recommendations for how or whether to proceed with Ms. Smith's transport and/or the safest way to do so.

79.     Around 8:00 p.m., Officer Lauderbaugh and Officer Morse were dispatched for assistance after receiving a report of a "combative mental health patient" in a McGonigle ambulance.

80.     At all relevant times, Officer Lauderbaugh and Officer Morse knew that Ms. Smith was acutely psychotic, and that she was being transported for an involuntary mental health commitment.

81.     Officer Lauderbaugh arrived at the scene prior to Officer Morse's arrival and observed Paramedic Chlpka and Paramedic Kerr attempting to restrain Ms. Smith inside the transport ambulance.

82.     EMT Amrhein and Paramedic Farinelli were outside the transport ambulance with injuries that were caused by Ms. Smith's violent behavior and were being attended to by EMT Bush.

83.     Officer Lauderbaugh immediately entered the back of the transport ambulance and handcuffed Ms. Smith's left wrist, and then used closed fist punches to the *back* of Ms. Smith's head to restrain her, all while driving her face first into the transport gurney.

84.     After being punched in the back of the head and driven into the gurney, Ms. Smith attempted to stand, at which time Officer Lauderbaugh again used closed fist punches to the back of her head, driving her even more forcefully into the gurney a second time.

85.     At all relevant times, Ms. Smith's face was restricted by the padding on the gurney and her body movement was restricted by Officer Lauderbaugh's restraint holds over her person, as well as the weight he was applying to the middle of her back through his knee.

86.     Ms. Smith was no longer resistive or combative after she was restrained on the gurney and Officer Lauderbaugh had her forcibly restrained in a prone position.

87.     During this time, Officer Lauderbaugh continuously dug his left knee into Ms. Smith's back, pushing her face further into the gurney, and causing her significant loss of oxygen as she struggled to breathe.

88.     Officer Morse arrived shortly thereafter.

89.     At that time, Officer Morse pulled Ms. Smith's right arm toward Officer Lauderbaugh, and she was handcuffed behind her back while she remained restrained in a prone position with her face compressed into the gurney depriving her of adequate ventilation.

90.     All the while, Officer Lauderbaugh continued to drive his knee into Ms. Smith's back while he held her face first onto the gurney, further depriving her of oxygen.

91.     Officer Lauderbaugh and Officer Morse, with the assistance of Paramedic Chlpka and Paramedic Kerr, then used additional soft restraints to further restrict her movement.

92.     Officer Lauderbaugh and Officer Morse left Ms. Smith in handcuffs under lock and key at all relevant times while she remained in the prone position.

93.     Officer Lauderbaugh, Officer Morse, Paramedic Chlpka and Paramedic Kerr restrained Ms. Smith on the transport gurney in a prone position with her hands handcuffed behind her back, and soft restraints bound over her feet, legs, back and shoulders.

94.     Officer Lauderbaugh, Officer Morse, Paramedic Chlpka, Paramedic Kerr, EMT Bush, EMT Amrhein, and Paramedic Farinelli all agreed to leave Ms. Smith fully restrained in a

prone position on the transport gurney, even though she was nearly unconscious, and even though she was visibly and verbally suffering from acute psychosis.

95.     Officer Lauderbaugh, Officer Morse, Paramedic Chlpka, Paramedic Kerr, EMT Bush, EMT Amrhein, and Paramedic Farinelli all knew or should have known that Ms. Smith was having difficulty breathing because of the way she was being restrained in a prone position.

96.     The EMS Defendants all knew or should have known that they were prohibited from restraining Ms. Smith in a prone position during transport.

97.     The EMS Defendants all knew or should have known that restraint in the prone position alters respiratory and cardiac physiology and significantly increases the risk of asphyxiation and/or cardiac arrest.

98.     The EMS Defendants all knew or should have known that Pennsylvania law, protocols, and regulations prohibited them from restraining Ms. Smith in a prone position.

99.     Ultimately and foreseeably, Ms. Smith went into cardiac arrest.

100.    Her arrest was caused by her prone restraint.

101.    When Ms. Smith went into cardiac arrest, Officer Lauderbaugh and Officer Morse were traveling separate from the transport ambulance and were the only people with access to the key to unlock the handcuffs that bound Ms. Smith's hand behind her back.

102.    Ms. Smith then developed asystole for several minutes—meaning, her heart's electrical system failed, causing her heart to stop pumping.

103.    The EMS Defendants significantly delayed resuscitative efforts, thereby contributing to Ms. Smith's neurological decline, and had no ability to remove the handcuffs that were binding her hands and inhibiting resuscitative efforts.

104.    Ms. Smith was finally moved to the supine position and CPR was initiated.

105.     Even though Ms. Smith was moved to the supine position, the handcuffs still bound her hands behind her back.

106.     Sharon Regional Hospital received Ms. Smith around 8:23 p.m., where she was brought to an emergency room in critical condition.

107.     At that time, medical staff at Sharon Regional Hospital directed Officer Lauderbaugh and/or Officer Morse to immediately remove her handcuffs.

108.     At that time, Sharon Regional Hospital took over her care.

109.     Ms. Smith was immediately intubated.

110.     Among other things, Ms. Smith suffered asphyxia, respiratory depression, cardiac arrest with asystole, seizures and anoxic encephalopathy resulting in permanent and profound brain injury from being restrained in a prone position while she was acutely psychotic, all of which was caused by the negligence and/or gross negligence of the Defendants as herein described.

111.     Miraculously, Ms. Smith's pregnancy survived.

112.     She gave birth to her daughter nearly nine months later.

113.     Ms. Smith, however, is unable to ambulate, speak, or otherwise communicate with her daughter because of the neurological and cognitive consequences of her injuries.

114.     As a direct and proximate cause of the conduct described herein, Ms. Smith lost nearly all her neurological functioning and is bedridden for what will likely be the remainder of her life, surviving only through artificial feeding tubes.

115.     As a direct and proximate cause of the conduct described herein, Ms. Smith is permanently disabled.

116.     As a direct and proximate cause of the conduct described herein, Ms. Smith suffered, and continues to suffer from, severe mental and emotional anguish.

**Count I**

**Excessive Force Pursuant to 42 U.S.C. § 1983**

**(Against Officer Lauderbaugh and Officer Morse)**

117.    All paragraphs herein are incorporated by reference.

118.    As a direct result of the conduct described herein, Officer Lauderbaugh and Officer Morse violated Ms. Smith's right to be free from the use of excessive force against her under the Fourth Amendment of the United States Constitution by effectuating an unlawful seizure or arrest using unjustified and excessive force.

**Count II**

**Failure to Intervene Pursuant to 42 U.S.C. § 1983**

**(Against Officer Lauderbaugh and Officer Morse)**

119.    All paragraphs herein are incorporated by reference.

120.    Officer Lauderbaugh and Officer Morse failed to intervene in the unjustified use of force and restraints that were used against Ms. Smith and applied to her person when they had reasonable opportunities to intervene and yet refused to do so.

**Count III**

**State Created Danger**

**(Against Officer Lauderbaugh and Officer Morse)**

121.    All paragraphs herein are incorporated by reference.

122.    Officer Lauderbaugh and Officer Morse had a constitutional duty to protect Ms. Smith against dangers that they themselves created, such as when they restrained her in the prone position during a mental health crisis, and then chose to leave her in that position, knowing that it constricted her chest and restricted her airways.

123.    The harm ultimately suffered by Ms. Smith was foreseeable and fairly direct to her being restrained in the prone position during an incident of acute psychosis where her breathing was restricted.

124.    Officer Lauderbaugh and Officer Morse had significant time to deliberate and remove Ms. Smith from the prone position after she was restrained, thereby moving her into a supine position so that she could breathe freely and without incident, yet they deliberately chose not to do so in a manner that shocks the conscience.

125.    At all relevant times, Officer Lauderbaugh and Officer Morse chose to act and restrain Ms. Smith in a way that created a relationship between them through which Ms. Smith was a foreseeable victim of their acts and/or omissions.

126.    Officer Lauderbaugh and Officer Morse's decision to place Ms. Smith under restraints in a prone position created a danger to her or rendered her more vulnerable to danger than had they not acted at all.

### Count IV

### Disability Discrimination, or in the alternative, Failure to Make Reasonable Accommodations under Title II of the ADA

### (Against Hermitage)

127.    All paragraphs herein are incorporated by reference.

128.    Ms. Smith was a qualified individual with a disability who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by Hermitage, by reason of her disability, in violation of the ADA.

129.    The HPD consistently responds to police situations involving citizens with mental health concerns, including citizens who are acutely psychotic at the time of the encounter.

130.     Hermitage ostensibly adheres to the ADA and is aware of the ADA (including Title II), as acknowledged in its policies, regulations, services, programs, and activities outside of its law enforcement activities.

131.     Hermitage is aware that citizens' federally protected rights under the ADA are likely to be violated unless it adopts and implements policies, and then trains its police officers on those policies, in the appropriate way to deal with citizens undergoing acute mental health issues to whom the police respond.

132.     Nevertheless, Hermitage has no policy relating to the way in which its police officers for the HPD are required to respond to citizen calls involving persons with mental health issues and those in acute psychosis, even though the HPD are often called upon to respond to calls for involuntary mental health commitments involving aggressive and violent mental health patients.

133.     Hermitage is aware that Pennsylvania law, protocols, and regulations often require its police officers to respond to requests for transports for involuntary mental health commitments because medical providers, including emergency service providers, are not equipped, trained, authorized, or deputized to respond to the risks posed by such transports in the way that a police officer would or should be.

134.     Hermitage is aware that acutely psychotic mental health patients pose an obvious and increased risk of harm to themselves and others, and when police officers like those employed by Hermitage in the HPD are called upon to assist in incidents involving acutely psychotic citizens, everyone involved in that incident is relying upon the police to ensure their safety.

135.     If Hermitage had adopted, implemented, and trained its officers on how to deal with acutely psychotic citizens during arrest or incident, then Ms. Smith would not have been left by its

police officers restrained in a prone position during a psychotic episode where her breathing was substantially restricted, and when she could have been restrained in the supine position without incident.

136.     Alternatively, a reasonable accommodation prohibiting police officers for the HPD from keeping acutely psychotic citizens from being restrained in a prone position for any prolonged period of time after the seizure is effectuated, and instead requiring those police officers to move the seized individual to the supine position, would have avoided the harm to Ms. Smith in this case.

## Count V

### Disability Discrimination, or in the alternative, Failure to Make Reasonable Accommodations under Title II of the ADA

### (Against Officer Lauderbaugh and Officer Morse)

137.     All paragraphs herein are incorporated by reference.

138.     Officer Lauderbaugh and Officer Morse knew that Ms. Smith was acutely mentally ill and psychotic at the time of their encounter, yet they deliberately and intentionally chose to restrain her in the prone position during a psychotic episode because she was acting aggressive, resistive, combative, and violent because of her psychosis, thereby causing her to suffer cardiac arrest.

139.     Officer Lauderbaugh and Officer Morse deliberately and intentionally chose to restrain Ms. Smith in the prone position, thereby restricting her ability to obtain oxygen, because they were motivated by prejudice, fear, and anger toward her psychosis and the harm and agitation it caused them.

140.    Alternatively, Officer Lauderbaugh and Officer Morse violated the ADA when arresting Ms. Smith by failing to provide reasonable accommodations to her restraints that would have given her access to oxygen and would not have restricted her airflow so as to cause cardiac arrest.

**Count VI**

**Direct Liability**

**(Against UPP, UPMC Horizon, and UPMC Greenville)**

141.    All paragraphs herein are incorporated by reference.

142.    At all relevant times, UPP, UPMC Horizon, and UPMC Greenville owed the following non-delegable duties to Ms. Smith:

    a.    The duty to use reasonable care in the maintenance of safe and adequate facilities and equipment,

    b.    The duty to select and retain only competent physicians and nurses,

    c.    The duty to oversee all persons who practice medicine and nursing within its walls as to patient care, and

    d.    The duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the patients.

143.    Ms. Smith relied upon these Defendants to uphold these duties.

144.    UPP, UPMC Horizon, and UPMC Greenville violated these duties in at least the following ways:

    a.    In failing to staff its hospital with competent healthcare personnel capable of appropriately receiving, reporting, documenting, and/or responding to acutely psychotic patients,

    b.    In failing to oversee its staff to ensure they were capable of appropriately receiving, reporting, documenting, and/or responding to acutely psychotic patients,

c.      In failing to staff its hospital with competent healthcare personnel capable of appropriately receiving, reporting, documenting, and/or responding to involuntary commitments of acutely psychotic patients, and the transport of the same,

d.      In failing to oversee its staff to ensure they were capable of appropriately receiving, reporting, documenting, and/or responding to involuntary commitments of acutely psychotic patients, and the transport of the same,

e.      In failing to formulate, adopt, and enforce adequate rules, policies, protocols, and/or regulations to ensure quality care for mental health patients, including those mental patients like Ms. Smith who require involuntary commitment and transport concerning the same,

f.      In failing to formulate, adopt, and enforce adequate rules, policies, protocols, and/or regulations to ensure the safety of patients and others during the process of involuntary commitments,

g.      In failing to formulate, adopt, and enforce adequate rules, policies, protocols, and/or regulations with respect to the transfer of patients to outside facilities and/or hospitals, and

h.      Failing to ensure to that healthcare providers and staff members practicing and/or administering care within their walls were communicating in a safe and reasonable manner to coordinate the care of mental health patients before and during transfer to outside facilities and/or hospitals.

145.    The negligence of UPP, UPMC Horizon, and UPMC Greenville increased the risk of harm to Ms. Smith.

146.    In the alternative, UPP, UPMC Horizon, and UPMC Greenville are vicariously liable for the acts, commissions, or omissions of Doctor Okubo, and others who acted and/or failed to act as though UPP, UPMC Horizon, and/or UPMC Greenville performed the acts or failed to perform the acts themselves.

147.    UPP, UPMC Horizon, and UPMC Greenville are responsible for at least the following negligent acts or omissions of the physicians and nurses who are their respective agents, ostensible agents, servants, and/or employees:

a.      Failing to educate, train, and ensure that staff members are following established policies, protocols, or guidelines for mental health patients, including mental health patients who are being involuntarily committed by them,

b.      Failing to educate, train, and ensure that staff members are familiar with how to communicate and coordinate the transfer of mental health patients during an involuntary commitment, including what information must be communicated and what orders must be provided and/or followed,

c.      Failing to appropriately restrain, or assist in the restraint of, Ms. Smith during transport,

d.      Causing Ms. Smith to not be restrained during a transport for an involuntary commitment,

e.      Failing to order restraints for Ms. Smith during transport for an involuntary commitment,

f.      Failing to provide pharmacological orders for sedation for an involuntary commitment of a known violent flight risk, or otherwise failing to provide medications or otherwise to abate or alleviate concerns over the risks associated with transporting Ms. Smith under an involuntary commitment,

g.      Failing to appropriately communicate and/or coordinate with EMS personnel or outside facilities and/or hospitals over Ms. Smith's transport under an involuntary commitment,

h.      Allowing nursing staff to practice without the supervision of a collaborating physician,

i.      Failing to follow pertinent parts of the Pennsylvania Code in connection with involuntary commitments,

j.      Failing to train and educate physicians and nursing staff on recognizing signs and symptoms of acute psychosis,

k.      Failing to train and educate physicians and nursing staff on recognizing signs and symptoms of mental health patients who pose an imminent risk of harm to themselves or others, and

l.      Failing to train and educate physicians and nursing staff on recognizing signs and symptoms of mental health patients who pose an imminent risk of flight.

**Count VII**

**Vicarious Liability**

**(Against UPP, UPMC Horizon, and UPMC Greenville)**

148.    All paragraphs herein are incorporated by reference.

149.    At all relevant times, UPP, UPMC Horizon, and UPMC Greenville agents, servants, and employees, including but not limited to Doctor Okubo, owed a duty to Ms. Smith to provide reasonably careful medical care that met the medical standard of care.

150.    UPP, UPMC Horizon, and UPMC Greenville, vicariously and/or ostensibly by and through their agents, servants and/or employees deviated from the medical standard of care owed to Ms. Smith in some or all the following ways:

    a.    Failing to educate, train, and ensure that his staff members were following established policies, protocols, or guidelines for mental health patients, including mental health patients who are being involuntarily committed by them,

    b.    Failing to educate, train, and ensure that his staff members were familiar with how to communicate and coordinate the transfer of mental health patients during an involuntary commitment, including what information must be communicated and what orders must be provided and/or followed,

    c.    Failing to appropriately restrain, or assist in the restraint of, Ms. Smith during transport,

    d.    Failing to consider Ms. Smith's history and diagnosis when determining the best and safety way to care, commit, and/or transport her under the circumstances,

    e.    Causing Ms. Smith to not be restrained during a transport for an involuntary commitment,

    f.    Failing to order restraints for Ms. Smith during transport for an involuntary commitment,

    g.    Failing to provide pharmacological orders for sedation for an involuntary commitment of a known violent flight risk, or otherwise failing to provide

medications or otherwise to abate or alleviate concerns over the risks associated with transporting Ms. Smith under an involuntary commitment,

h.    Failing to consult with other healthcare providers or specialists including psychiatrists to determine the best and safest way to care for, commit, and/or transport Ms. Smith,

i.    Failing to appropriately communicate and/or coordinate with EMS personnel or outside facilities and/or hospitals and/or UPMC Greenville staff over Ms. Smith's transport under an involuntary commitment,

j.    Allowing nursing staff to practice without his supervision,

k.    Failing to follow pertinent parts of the Pennsylvania Code in connection with involuntary commitments,

l.    Failing to recognize the signs and symptoms of acute psychosis and the dynamics in which it poses,

m.    Failing to recognize the signs and symptoms of mental health patients who pose an imminent risk of harm to themselves or others, and

n.    Failing to recognize the signs and symptoms of mental health patients who pose an imminent risk of flight.

151.    Doctor Okubo's negligence increased the risk of harm to Ms. Smith and was a cause in fact to the injuries she suffered, as set forth in detail in this Complaint.

## Count VIII

## Medical Negligence

## (Against Doctor Okubo)

152.    All paragraphs herein are incorporated by reference.

153.    At all relevant times, Doctor Okubo owed a duty to Ms. Smith to ensure her safety and care as her attending physician, yet he violated this duty in at least the following ways:

a.    Failing to educate, train, and ensure that his staff members were following established policies, protocols, or guidelines for mental health patients, including mental health patients who are being involuntarily committed by them,

b.     Failing to educate, train, and ensure that his staff members were familiar with how to communicate and coordinate the transfer of mental health patients during an involuntary commitment, including what information must be communicated and what orders must be provided and/or followed,

c.     Failing to appropriately restrain, or assist in the restraint of, Ms. Smith during transport,

d.     Failing to consider Ms. Smith's history and diagnosis when determining the best and safety way to care, commit, and/or transport her under the circumstances,

e.     Causing Ms. Smith to not be restrained during a transport for an involuntary commitment,

f.     Failing to order restraints for Ms. Smith during transport for an involuntary commitment,

g.     Failing to provide pharmacological orders for sedation for an involuntary commitment of a known violent flight risk, or otherwise failing to provide medications or otherwise to abate or alleviate concerns over the risks associated with transporting Ms. Smith under an involuntary commitment,

h.     Failing to consult with other healthcare providers or specialists including psychiatrists to determine the best and safest way to care for, commit, and/or transport Ms. Smith,

i.     Failing to appropriately communicate and/or coordinate with EMS personnel or outside facilities and/or hospitals and/or UPMC Greenville staff over Ms. Smith's transport under an involuntary commitment,

j.     Allowing nursing staff to practice without his supervision,

k.     Failing to follow pertinent parts of the Pennsylvania Code in connection with involuntary commitments,

l.     Failing to recognize the signs and symptoms of acute psychosis and the dynamics in which it poses,

m.     Failing to recognize the signs and symptoms of mental health patients who pose an imminent risk of harm to themselves or others, and

n.     Failing to recognize the signs and symptoms of mental health patients who pose an imminent risk of flight.

154.     Doctor Okubo's negligence increased the risk of harm to Ms. Smith and was a cause

in fact to the injuries she suffered, as set forth in detail in this Complaint.

**Count IX**

**Gross Negligence**

**(Against McGonigle Ambulance)**

155.     All paragraphs herein are incorporated by reference.

156.     The gross negligence and willful and gross misconduct of McGonigle Ambulance

and its agents, ostensible agents, servants, and/or employees includes at least the following:

a.     Failing to appropriately restrain or sedate Ms. Smith, or otherwise act to abate her acute psychosis, prior to transport when they knew or should have known that she posed an imminent flight risk,

b.     Failing to properly care for, restrain, monitor and/or transport Ms. Smith as the circumstances of her medical condition required,

c.     Failing to transport Ms. Smith in such fashion as would have avoided or prevented her being restrained in the prone positions and/or suffering cardiac arrest with asystole,

d.     Failing to request additional assistance necessary to ensure Ms. Smith's safe transport and involuntary commitment,

e.     Failing to seek assistance, input, direction, and/or a second opinion from a medical professional other than Doctor Okubo or the healthcare staff at UPMC Greenville, including but not limited to a medical command physician or officer regarding the best and safest was to care for, commit, retrain and/or transport Ms. Smith under the circumstances,

f.     Failing to appropriately restrain or sedate Ms. Smith, or otherwise act to abate her acute psychosis, prior to transport when they knew or should have known that she posed an imminent risk of harm to herself or others,

g.     Restraining Ms. Smith in a prone position for a prolonged period during transport when they knew or should have known that she was acutely psychotic,

h.  Restraining Ms. Smith in a prone position for a prolonged period during transport when they knew or should have known that her respiratory airways were restricted,

i.  Restraining Ms. Smith in a prone position for a prolonged period during transport when they knew or should have known that her chest was constricted,

j.  Failing to timely relieve Ms. Smith from her restrained prone position in order to prevent her foreseeable asphyxiation and cardiac arrest,

k.  Restraining Ms. Smith in a prone position with her hands handcuffed behind her back under lock and key for a prolonged period during transport when they knew or should have known that the key to the handcuffs was not within their possession or immediate vicinity,

l.  Failing to timely respond to Ms. Smith's cardiac arrest,

m.  Failing to formulate, adopt, and enforce adequate rules, policies, protocols, and/or regulations to ensure that mental health patients are restrained during involuntary commitments (or, in the alternative, failing to adhere to the protocols and regulations of McGonigle Ambulance that acutely psychotic mental health patients who pose and imminent risk of flight or harm are restrained during transport),

n.  Failing to formulate, adopt, and enforce adequate rules, policies, protocols, and/or regulations to ensure that mental health patients are never restrained in the prone position during transport (or, in the alternative, failing to adhere to the protocols and regulations of McGonigle Ambulance that prohibit prone restraints),

o.  Failing to assess for acute psychosis including psychiatric or behavioral disorder who is at imminent risk of injury to self or others,

p.  Failing to assess for flight risks,

q.  Failing to assess for underlying drug intoxication or overdose,

r.  Failing to maintain patient dignity,

s.  Failing to restrain in the least restrictive method of restraint to protect patient safety,

t.  Failing to utilize de-escalation techniques or pharmacologic management,

u.      Failing to act for the safety, medical monitoring, and clinical care of the patient,

v.      Failing to restrain the patient to protect herself and others from harm or the risks of harm,

w.      Failing to restrain the patient when she lacked decisions-making capacity,

x.      Failing to restrain the patient as an involuntary mental health commitment,

y.      Failing to restrain the patient when she presented a direct threat to EMS providers,

z.      Failing to utilize resources like high concentration oxygen via NRB masks,

aa.     Failing to contact medical command for an order for restraints or pharmacological treatment,

bb.     Failing to restrict the patient enough to reasonable prevent escape from the vehicle or harm to EMS providers,

cc.     Failing to monitor the patient after being restrained,

dd.     Failing to restrain the patient in the supine position,

ee.     Restraining the patient in a prone position,

ff.     Failing to transition from handcuffs by law enforcement to less restrictive restraints,

gg.     Failing to allow police officers to accompany the patient in the transport ambulance when she was handcuffed under lock and key,

hh.     Placing restraints in a manner that interfered with evaluation and treatment of the patient,

ii.     Restraining the patient in a manner that compromised her respiratory effort,

jj.     Failing to provide physiological monitoring and clinical assessment and/or reassessment of respiratory and hemodynamic status after restraints were applied,

kk.     Failing to document reassessments of restraints and associated evaluation findings and additional care during transport,

ll.     Restraining the patient with her hands handcuffed behind her back,

mm.     Restraining the patient in a manner that constricted her chest, and

nn.     Restraining the patient in a prone position including during an acute mental health crisis and psychosis.

157.    McGonigle Ambulance acted with gross negligence and conscious disregard of the risks associated with the foregoing failures, which resulted in the catastrophic injuries suffered by Ms. Smith.

158.    Ms. Smith sustained serious, life-altering injuries because McGonigle Ambulance's gross negligence and willful misconduct.

**Count X**

**Gross Negligence**

**(Against EMS Defendants)**

159.    All paragraphs herein are incorporated by reference.

160.    The gross negligence and willful and gross misconduct of the EMS Defendants includes at least the following:

a.     Failing to adhere to the protocols and regulations of McGonigle Ambulance that prohibit prone restraints,

b.     Failing to assess for acute psychosis including psychiatric or behavioral disorder who is at imminent risk of injury to self or others,

c.     Failing to assess for flight risks,

d.     Failing to assess for underlying drug intoxication or overdose,

e.     Failing to maintain patient dignity,

f.     Failing to restrain in the least restrictive method of restraint to protect patient safety,

g.     Failing to utilize de-escalation techniques or pharmacologic management,

h.  Failing to act for the safety, medical monitoring, and clinical care of the patient,

i.  Failing to restrain the patient to protect herself and others from harm or the risks of harm,

j.  Failing to restrain the patient when she lacked decisions-making capacity,

k.  Failing to restrain the patient as an involuntary mental health commitment,

l.  Failing to restrain the patient when she presented a direct threat to EMS providers,

m.  Failing to utilize resources like high concentration oxygen via NRB masks,

n.  Failing to contact medical command for an order for restraints or pharmacological treatment,

o.  Failing to restrict the patient enough to reasonable prevent escape from the vehicle or harm to EMS providers,

p.  Failing to monitor the patient after being restrained,

q.  Failing to restrain the patient in the supine position,

r.  Restraining the patient in a prone position,

s.  Failing to transition from handcuffs by law enforcement to less restrictive restraints,

t.  Failing to allow police officers to accompany the patient in the transport ambulance when she was handcuffed under lock and key,

u.  Placing restraints in a manner that interfered with evaluation and treatment of the patient,

v.  Restraining the patient in a manner that compromised her respiratory effort,

w.  Failing to provide physiological monitoring and clinical assessment and/or reassessment of respiratory and hemodynamic status after restraints were applied,

x.  Failing to document reassessments of restraints and associated evaluation findings and additional care during transport,

y.  Restraining the patient with her hands handcuffed behind her back,

z.  Restraining the patient in a manner that constricted her chest, and

aa.  Restraining the patient in a prone position including during an acute mental health crisis and psychosis.

161.  The EMS Defendants acted with gross negligence and conscious disregard of the risks associated with the foregoing failures, which resulted in the catastrophic injuries suffered by Ms. Smith.

162.  As a direct and proximate cause of the EMS Defendants' gross negligence, Ms. Smith sustained serious, life-altering injuries.

## Count XI

## Intentional Infliction of Emotional Distress

## (Against All Defendants)

163.  All paragraphs herein are incorporated by reference.

164.  Defendants, individually, or through their own acts and/or vicariously through their respective agencies, ostensible agencies, servitudes, and/or employment, where applicable, engaged in outrageous and extreme misconduct by failing to properly communicate the need to restrain Ms. Smith during transport under and involuntary commitment for mental health treatment, when she posed an obvious imminent risk of flight or harm, causing her to arrest and suffer debilitating physical injuries, humiliation, and embarrassment.

165.  Defendants, individually, or through their own acts and/or vicariously through their respective agencies, ostensible agencies, servitudes, and/or employment, where applicable, engaged in outrageous and extreme misconduct by failing to restrain Ms. Smith during transport under an involuntary commitment for mental health treatment, and then improperly restraining her

in a prone position that restricted her breathing and oxygen intake, causing her to arrest and suffer debilitating physical injuries, humiliation, and embarrassment.

**Prayer for Relief**

WHEREFORE, Ms. Smith respectfully requests that judgment be entered in her favor and against Defendants as follows:

(i) Actual and special damages as to all Counts,

(ii) Compensatory damages as to all Counts,

(iii) Punitive damages as to all Counts,

(iv) Attorney's fees, witness fees and costs as to Counts I through V, and

(v) All other relief as this Court deems just and proper.

Respectfully submitted,

O'BRIEN COLEMAN & WRIGHT, LLC

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

116 Boulevard of the Allies
Pittsburgh, Pennsylvania 15222
(412) 260-1662
abw@obrienlawpgh.com

and

LUPETIN & UNATIN, LLC

/s/ Brendan B. Lupetin
Brendan B. Lupetin
Pa. ID No. 201164

707 Grant Street, Suite 3200
Pittsburgh, Pennsylvania 15219
(412) 281-4100
blupetin@pamedmal.com

*Co-counsel for Plaintiff*